Good evening, your honors. May it please the court, Jeffrey Dickerson from Reno, Nevada, representing the appellant Wen Dai. Ms. Dai was born in China and came to the United States and took up a job with Freeman & Williams, an accounting firm in Carson City, Nevada. She was terminated on July 6th of 2005, and that's why we're here. She alleges in this case that she was discriminated against in that termination based upon her national origin and based upon her race being Asian. The primary case was found to be established by the district court, and the pivotal issue, I think, turns on a couple of things. One is, well, pretext primarily, and the same-actor defense and whether or not that applies, because I would submit to the court with all due respect that if the same-actor defense doesn't apply, there's abundant evidence of pretext, in other words, conflicting evidence with respect to the rationale for termination that would allow a reasonable juror to conclude that the employer's rationale is not credible. She's got pretty awful evaluations. Those are pretty mediocre at best. And she never saw them. She was terminated without ever having the opportunity to see those. To the extent that excerpts from it were orally, if you will, passed on to her in that closing exit interview, she had a rebuttal for each one of them, as she does here when she was deposed. In the record, each one of those items were gone through by appellee's counsel, and each one of those were rebutted. And we pointed that out in the record, Your Honor. Rebutted by? By the plaintiff. By Ms. Dye. Yes. Well, but she's got a pretty consistent record across all of the evaluations. Well, those evaluations have – they certainly differ from each other, which shows that they – which may demonstrate that they are discerning evaluations, but they are pretty uniformly negative. There's one in there from Ms. Smith indicates that her prospects in the future with the firm are fair. They're not all totally negative. She – the whole evaluation process, I think, is what the credibility issue is. She was given oral evaluations, is that correct? And according to her, they were all good and they were all commendable, and that she was complying with orders and that she was responding to review notes in an appropriate manner, that she was not argumentative, as they stated, that she was not difficult to listen to orders, that she followed orders, that she would take directives. She disputed that she was argumentative, and nobody ever told her that she was argumentative. So these things that are found in the evaluations are open to question if the plaintiff is to be believed, and that's what we do. Does she have any other evidence other than her own say-so that she wasn't argumentative, other than her own argument that she wasn't argumentative? Is there anybody else who will say, Mr. I was not argumentative and I don't know what the rest of the folks here at Freeman & Williams are talking about? I don't think so. Okay, so all we have is her say-so that she wasn't argumentative. Correct. Against everybody at Freeman & Williams who perceived that she was argumentative. In the closing evaluations that she never was provided with, and she was never confronted with that. Yeah, at some point, counselor, in our ordinary personal relationships, we're going to have to evaluate other folks even if they disagree with our evaluation, right? So sort of rightly or wrongly, I may make a judgment about people that I'm working with, but that doesn't mean that it's pretext. Well, it does if the plaintiff contests it and puts it in issue. Counsel, what do you do with our case, Cornwell Electra, which says that it's not enough to defeat summary judgment just by the plaintiff denying the credibility of the proper reasons? What do you do with that case authority? Well, I think there's more than that. What is argumentative, Your Honor? It's not explained. There are no specific examples given other than she would ask questions. And the whole concept of her being brought on board with her lack of public accounting experience was that it was going to be a learning process and everybody knew and agreed to this. And so there's going to be an interchange every time that one of the partners or one of the senior staff accountants or one of the managers or partners want to address her. The review note's a great example where there's interaction there. She comes back. She says, What do you mean by this review note? There's interchange. Now, at what level does it become argumentative? Her testimony is that she didn't have the capability of arguing with anybody about a particular point because she was on a learning curve. And they had said that she was on a learning curve. So I think that evidence can be considered by a reasonable juror in determining whether or not the, quote, argumentative accusation is in fact correct. Again, Counsel, the fact that two people perceive a situation differently doesn't mean that one of them is necessarily lying. That's true. I would agree with that, Your Honor. So what corroboration does she have that she was not argumentative other than her own say-so? Well, we've answered that question. And I would turn it around and say what corroboration do they have that she was argumentative? The fact that they've got a number, a whole number of different people offering written evaluations in which they say that she's argumentative and that they didn't like her work and that they didn't think that she had much future and that she wasn't terribly cooperative and that her work was not satisfactory. We have a whole bunch of different people. We don't have one person from Freeman and Williams or somebody from the outside who said she was set up to fail from the outset and these folks are lying on their evaluations. Well, these people that are saying that she was argumentative, how many of them, I would rhetorically ask, how many of them actually had experience with her? Keep in mind that there was a range of people that were asked to do evaluations. Mayhew testified that the persons that are supposed to do the evaluation are people that actually worked with her. Which, of course, would have only narrowed the number of people evaluating her and it still wouldn't have changed the result. They still think she's argumentative. What Freeman and Williams did was ask a broad cross-section of their employees what their experience was with Ms. Dye. It was not satisfactory. Well, I would disagree with a broad cross-section of employees. I mean, it was up to the partnership level and managerial level. How many different people filled out evaluations? I think there were seven to ten, somewhere in there. They are what they are, but the question before the court is, is there evidence to take it to a jury? A jury can reach the conclusions in favor of the appellee. A jury can reach the conclusions in favor of the appellant. It's not a situation of just the plaintiff denying that she was argumentative. There's other evidence in terms of the manner in which the evaluation process was done, the fact that people were given evaluations to fill out, having no experience with her whatsoever, and completed those evaluations. So the process is in question. And therefore, the conclusions of that process, a reasonable juror could conclude, those, too, should be questioned. But you have to raise a material issue of fact first, right? Correct. And you think that Ms. Dye's disagreement with the evaluations is enough to raise a material question of fact? I think it is, Your Honor, because the plaintiff's testimony is not self-serving. She's specific in terms of what she's saying. She goes into you can see from her testimony that she is particular and she's specific and she's not evasive. And each of those, when she's confronted with those questions, and I would urge the Court to read her testimony, it's not an equivocal denial of being argumentative. She actually has backup for it. In other words, like I said before, how could I be argumentative? I don't know what the answer is. I can't argue. Can we go back for just a minute to the same actor rule? Do you think it has no application in this case? I don't think it has any application in this case, Your Honor. It's true, isn't it, that two of the people who sat on the personnel committee, and that's the committee that made the decision to fire her, one of those people actually was the hiring official, Williams, right? Correct. And another actually recommended her for promotion from a part-time to a full-time position during the course of her employment there. That's the Leviathan, I think was his name? That's a mistake that the district court made in interpreting the record, I would submit. Let me address that briefly, if I may. And I'll get back to the – I'll answer your question. I think I understand where you're going. Mr. Leviathan – Leviathan? Anyway. Mr. V. Yeah, we call him Mr. V of Shep. That's what we called him during the litigation. Vatheon. Vatheon. Yeah, Vatheon. Mr. Vatheon was her supervisor, if you will. Mayhew would give her the work, and Vatheon would review the work ultimately and do review notes. But he recommended her for movement from a part-time position to a full-time position, Mr. Vatheon. If you look at the testimony and the evidence in that regard, Mr. Williams is the one that made that decision. Okay. Let's stick with him then. He was on the personnel committee that decided to fire her, right? He was. Now, I understand it wasn't his exclusive decision, but presumably he gave his observations, listened to the observations of others at the time the termination decision was made. Why would there be no application of the same-actor rule, given that Williams both hired her and joined in the decision to fire her? Well, I would say that to that extent, literally, the same-actor defense would apply. But there's a question of fact there as to what involvement he really had in the decision to terminate. In this manner, in this respect, the evidence of the plaintiff is and the evidence of Mr. Williams himself is that he really had no experience in evaluating her. He had no hands-on with her, hardly at all, other than the passage in the hallway to say hi. So for him to be evaluating and part of the committee that does the evaluations and reviews the evaluations and makes the determination to terminate her based upon that, he lacks the personal knowledge to reach the conclusions that he's putting forth in his affidavit in support of the motion for summary judgment. He lacks the foundation to make a decision to terminate her based upon performance. And then there's the issue of the reason he gives for the termination, as backed up by Ms. Mayhew's memo of that meeting, was that she was not performing at senior level. But he hired her knowing that she was an entry level and that she would not be a senior level for three to four years. So I don't think the same actor defense applies, or inference, if you will, or presumption, whatever the Court wants to refer to it as. I don't think it applies. But even if it does, Your Honor, we still have extraordinarily good evidence of pretext. And what do you reach that level? We have in this case, I've gone through some of the facts and the brief details them to the extent that I think the facts clearly stated in the opening brief are established in the record. And if you take those facts as true, constrain the evidence in a light most favorable to the plaintiff on a motion for summary judgment, I think that the district court made a mistake. He got it wrong here. And that summary judgment ought to be reversed because a reasonable jury can't. Counsel, we've exceeded your time. Thank you. Thank you. Good morning, Don Willenberg, Board Member, East San Francisco. Could you raise your voice, please? It's difficult to hear you. I will. I will raise the microphone as well. Not too much. Ms. Dye was a mismatch for this job, that she was of Chinese origin and was fired as a matter of coincidence, not cause and effect. Ms. Dye admits that her experience was a mismatch. She admits that she did not know how to do tax returns, which is a primary function of her job in this public accounting firm. She admits that on the one early job where she got positive feedback, she, quote, got lucky, unquote. She admits that her task on that job was primarily data entry. It was not serious or senior-level or fairly even staff-level accounting work. Against these kinds of admissions, she offers only theory and speculation as to whether or not there was any sort of discriminatory purpose. Counsel, what about opposing counsel's representation that she was never given the opportunity to review the evaluations? Irrelevant. Why? It's irrelevant because, number one, she's an at-will employee and doesn't have necessarily a right to review those, and, two, if the evaluations state, if they articulate a non-discriminatory purpose for the job action taken, that's enough. I'm unaware of any cases requiring that the employee be given any particular form of prior notice about the employee's unsatisfactory job performance. Was it Freeman and Williams' practice to provide the evaluation forms to their employees? It was often. I don't believe that we have anything in the record as to a uniform practice one way or another. Is there evidence in the record that other employees were given the evaluations and Ms. Dye was not? There may be in Ms. Fletcher's, again, as a general rule. But wouldn't that be deviation from established procedure? Isn't that some evidence of pretext? Potentially. Potentially. But not here. Was she given oral evaluations? She was given oral evaluations in the form of review notes, particularly by Jeff V., Mr. V. Was she told that she was argumentative? She was not told. The record does not say that at that time she was argumentative. The record does show at that time that she was told that she was not completing forms properly and that she was not grasping the fundamental principles of private accounting and that she wasn't understanding how to prepare a tax return. Again, something that she admits, one of the points that she makes in trying to deflect the argumentative concern, was to say, well, of course I was going to ask questions and talk back because I didn't know my job. I didn't know what to do unless they told me. The evidence is that Freeman and Williams hired her with the hope that her degrees and her years of experience in private accounting would enable her to transform and become and work well in the public accounting system as well. That turned out to not be true. What's your response to opposing counsel's observation that Ms. Dye had a response to each one of the negative comments that was made about her and she was not allowed to articulate those? I would go back to the case that Your Honor pointed out, Cornwell and Bradley, which says that both of which cases say that an employee's own statements or perceptions of their job performance is not enough to defeat summary judgment and to raise a genuine issue of material fact. So the fact that she and her counsel could later go through and say, well, this isn't true for that reason, this isn't true for that reason, isn't enough to raise an issue. Beyond which, all those go to is whether or not Freeman and Williams gave reason or had enough backing for their reasons. It still doesn't go to anything to show that there was any racial animus or discriminatory purpose in hiring her. In firing her? Pardon me? In firing her? I thought you said in hiring her. Well, it's definitely true in firing her, not in hiring her, because she was hired not once but really twice and was promoted once in the year preceding the time that she was discharged. In fact, Freeman and Williams didn't just hire her when she came to apply. They met her at a job fair in November and went digging through their files, pulled out her resume months later in June of the next year, 2003, and went out their way to go and pick her up, which I think is perfectly consistent with the same actor's concerns. The people who decided to hire her, again, not once but twice, and then promote her were the same people who were involved in the decision to terminate her. And in fact, I think you asked the council a question about the number of people who had evaluated her, and I think that's a good point. Yes, there were seven people, not just the two, Williams and Jeff Beek, who were involved in that decision. That's seven people out of a firm of 22. That seems like certainly a larger group than the populations in my firm of individuals, and it represents a serious attempt to get a broad spectrum of opinion and experience with Ms. Dodd. That perspective was almost uniformly very negative. At best, it was mediocre. The best review we've heard, or that is in the record, was that her prospects for long term were difficult to determine because she'd only been here a year. Her prospects for short term were, quote, fair, which is certainly enough for an employer, in opposition of Greg's trust to their clients, to say this is not enough. That review came about also, although perhaps not all of the review process went exactly as every other print and link review process did. It did take place at the same time and in the same general manner. They reviewed employees who may apply to be here, which makes sense for a public accounting firm because that's just after the tax season. So this was just after the personal income tax season. Two people, they'd seen her work, they took a look at her work, they asked a number of people, including the principal of the firm on whom she had prevailed, just to buy a gig to hire her part-time, saying, I have all this other private accounting experience, I translate that into public accounting experience, give me a chance. They gave her a chance. It didn't work out. It's unfortunate, but it's not discrimination. It's not prefect. It's not enough evidence in this record to overturn the decision to award company debt. Thank you, Counsel. We'll give you one minute for rebuttal, Counsel. The question was asked about the procedures of the firm with respect to evaluations.  Excerpts of Record 173, Paragraph 35 of Fletcher's declaration states, the firm administrator and I generally compile the returned evaluations, except for the employee's self-evaluation, into a single computer-generated formal evaluation, which is presented to the employee during their evaluation. This keeps the evaluations anonymous. With that, I submit. Thank you, Your Honor. All right. Thank you. Thank you to both counsel. The case has argued and is submitted for decision at court.
judges: Rawlinson, Bybee, Burns